## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIRGINIA TOMASIAN and ROGER BALADI, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>SUBARU OF AMERICA, INC.,<br><br>      Defendant. | No. _____<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**<u>CLASS ACTION</u>** |

### <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Virginia Tomasian and Roger Baladi ("Plaintiffs") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendant Subaru of America, Inc. ("Subaru").

### <u>INTRODUCTION</u>

1.     This is a class action brought against Subaru by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of 2016-2020

Subaru Outbacks and 2019-2020 Subaru Ascents (the "Class Vehicles").[1]

2.      The Class Vehicles suffer from a defect that causes the battery to rapidly drain (the "Battery System Defect" or "Defect"), ultimately leaving the consumer with a dead battery and a disabled vehicle. The Battery System Defect manifests unexpectedly, requiring drivers to incur unforeseen expenses such as those required to obtain roadside service, mobile battery jump packs, and repeated battery replacements.

3.      The Battery System Defect renders the Class Vehicles inoperable and, thus, affects their central functionality. The Battery System Defect also poses a safety hazard for drivers and their passengers who can be left stranded when Class Vehicles manifest the Defect.

4.      Subaru is aware of the Battery System Defect but has not eliminated it. Subaru's knowledge of the widespread battery problems with its vehicles is evidenced by a related service bulletin in 2017 specifically describing the Battery System Defect and by the large numbers of consumers who have complained about this Defect, including when consumers brought their Class Vehicles to Subaru's authorized dealers for repairs.

5.      Subaru's repairs consist of replacing Class Vehicle batteries. But

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles.

because the Battery System Defect exists within all of the Class Vehicles, replacement of the battery with the same battery is ineffective, and exposes drivers to instances of repeat failure.

6.     The Defect renders the Class Vehicles unsuitable for their intended purpose—driving. The Battery System Defect is substantially certain to manifest in the Class Vehicles, and many Class Members have had their batteries die multiple times. At least hundreds of drivers have reported experiencing an unexpected battery drain event in a Class Vehicle.

7.     Due to the undisclosed Battery System Defect, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing the Subaru vehicles at issue. Plaintiffs accordingly seek relief both for themselves and for other owners or lessees of these Class Vehicles.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because Subaru is headquartered and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, Subaru advertises in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

10.     This Court has personal jurisdiction over Subaru because it is headquartered in this judicial district, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

## PARTIES

### Plaintiff Virginia Tomasian (California)

11.     Plaintiff Virginia Tomasian is a citizen and resident of Clovis, California.

12.     In June 2016, Ms. Tomasian purchased a new 2017 Subaru Outback from Lithia Subaru, which is an authorized Subaru dealership located in Fresno, California.

13.     Ms. Tomasian purchased her vehicle for personal, family, or household use. Her Class Vehicle bears the following VIN: 4S4BSANC5H3409158.

14.    Prior to purchase, Ms. Tomasian encountered Subaru representations concerning the reliability of its vehicles in advertisements and sales materials, including a Subaru advertisement that stated most Subaru Outbacks were still operating after 10 years of use.

15.    Ms. Tomasian uses (and at all times has used) her Class Vehicle in the normal and expected manner.

16.    Prior to purchase, Ms. Tomasian read or was otherwise aware that her vehicle came with the Subaru New Vehicle Limited Warranty. Her warranty will expire in June 2020.

17.    The battery in Ms. Tomasian's Subaru died approximately three times in 2019.

18.    In or around January 2019, Ms. Tomasian's Subaru was parked outside of a restaurant in Fresno, California, when it failed to start. Plaintiff was forced to jump-start her battery in order to restore functionality.

19.    In or around February 2019, Ms. Tomasian's Subaru was parked outside of DeYoung Properties, which is a home builder and mortgage provider based in Fresno. Her Subaru would not start, at which point an employee from a neighboring Infinity car dealership attempted to jump start her Subaru's battery without success. Her vehicle was subsequently towed to her local Subaru dealership where technicians jump-started the car's battery in order to restore functionality.

20.    In or around March 2019, Ms. Tomasian's Subaru was parked outside of Wathen Castanos Homes in Clovis, California, when it failed to start. She called AAA roadside assistance for help. When he arrived, the AAA serviceman had to jump start her car battery in order to restore functionality.

21.    After the multiple failures of her car battery, Ms. Tomasian contacted her Subaru dealership to replace the battery.

22.    Based on experience with her last battery and the nature of the Defect, Ms. Tomasian is likely to suffer more battery failures, which will not be covered by her Subaru New Vehicle Warranty once it expires in June 2020.

23.    Had Subaru disclosed the Defect, Ms. Tomasian would not have purchased her Class Vehicle or would have paid significantly less for it.

24.    Ms. Tomasian's vehicle has also suffered diminution in value due to the Defect and the resulting loss in her Subaru vehicle's resale value.

**Plaintiff Roger Baladi (New York)**

25.    Plaintiff Roger Baladi is a citizen and resident of Brooklyn, New York.

26.    In April 2018, Mr. Baladi purchased a new 2018 Subaru Outback from Milea Subaru, which is an authorized Subaru dealership in Bronx, New York.

27.    Mr. Baladi purchased his vehicle for personal, family, or household use. His Class Vehicle bears the following VIN: 4S4BSENC8J3292494.

28.    Prior to purchase, Mr. Baladi saw Subaru representations in

advertisements and sales materials touting the reliability and quality of its vehicles, including multiple online advertisements about the reliability and quality of Subaru's vehicles on its website.

29.   Mr. Baladi uses (and at all times has used) his Class Vehicle in the normal and expected manner.

30.   Prior to purchase, Mr. Baladi read or was otherwise aware that his vehicle came with the Subaru New Vehicle Limited Warranty. His warranty will expire in April 2021.

31.   Mr. Baladi's vehicle's battery died several times within the first few months of ownership. Multiple incidences of the battery drain occurred between October and December 2018 and then again between January and March 2019. Each time, Plaintiff's Outback would not start, and he was left without use of his vehicle. Mr. Baladi was forced to jump-start his battery in order to restore functionality.

32.   Because of this series of battery failures, on or around March 13, 2019, Mr. Baladi took his vehicle into Koeppel Subaru, a dealership in Queens, New York, which replaced his battery.

33.   After this battery replacement, Mr. Baladi's battery then failed several more times. Two of these subsequent battery failures inconveniently occurred at JFK International Airport and at a shopping center in northern New Jersey.

34.   Due to the unreliability of his car's battery and its inability to start, in or

around October 2018, Mr. Baladi purchased jumper cables for $35 and a portable jump starter for $150 from Walmart to have on hand in case of being left stranded by the unpredictable failure of his vehicle's battery.

35.    Based on experience with his original and replacement batteries and the nature of the Defect, Mr. Baladi is likely to suffer more battery failures, which will not be covered by his Subaru New Vehicle Limited Warranty once it expires in April 2021.

36.    Had Subaru disclosed the Defect, Mr. Baladi would not have purchased his Class Vehicle or would have paid significantly less for it.

37.    Additionally, as a result of the Defect, Mr. Baladi has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, loss of use of his vehicle, and lost time. His vehicle has also suffered diminution in value due to the Defect and the resulting loss in his Subaru vehicle's resale value.

**Defendant**

38.    Subaru is a New Jersey corporation with its principal place of business in Camden, New Jersey.

39.    Subaru is engaged in the business of designing, manufacturing, warranting, marketing, advertising and selling vehicles, including the Class Vehicles, under the "Subaru" brand name through a network of more than 600 dealerships in the United States.

40.    The design, manufacture, distribution, service, repair, modification, installation and decisions regarding the batteries, electrical systems, and other components within the Class Vehicles were controlled exclusively by Subaru and its agents and affiliates.

## FACTUAL ALLEGATIONS

### A.    The Battery System Defect

41.    People depend on their automobiles to provide reliable and safe transportation. The battery is an essential component of any vehicle: it powers the vehicle and allows the engine to start and the car to work. Generally, sport utility vehicle batteries have a useful life of four to six years.

42.    The Class Vehicles suffer from a Defect that prematurely renders them inoperable. The Defect causes unexpected and reoccurring battery drain resulting in premature battery failure under ordinary use.

43.    When this Battery System Defect manifests and the battery fails, the engine in the Class Vehicle will not start, and the vehicle is rendered completely inoperable. Drivers are stranded and must seek roadside assistance or alternative means of transportation. Given the serious and varied dangers from being left stranded, the Defect presents a clear safety hazard.

### B.    Subaru's Disclosures About its Vehicles

44.    Subaru markets its vehicles as safe and reliable, and it could have used

its marketing to disclose the defect in addition to its dealers and sellers. For example, Subaru advertises its Outback models as having "go-everywhere capability." Subaru also represents that Class Vehicles are "built to take you to the place you've never been,[2] "mak[ing] more destinations possible," "the most adventurous, most reliable, and safest," and "built to minimize limits and maximize versatility, durability and all-around safety. This means you can explore that new destination you have in mind, take the scenic route, and go without hesitation."[3] "When you're ready for life's next big adventure, the all-new 2019 Ascent™ is ready to take you to new heights,"[4] Subaru boasts. "And you'll always drive with confidence, thanks to legendary Subaru quality, durability and reliability."[5] While Subaru had the opportunity to simultaneously disclose the Defect with these representations, it chose instead to actively conceal this material information from Plaintiffs and similarly situated consumers.

---

[2] https://www.subaru.com/vehicles/outback/previous-year/index.html (Outback 2019 Model).

[3]
https://www.subaru.com/guides/outback/my19/?utm_source=com&utm_medium=cta&utm_term=OBK&utm_campaign=VSP&utm_content=MY19 (Outback 2019 model)

[4]
https://www.subaru.com/guides/ascent/my19/?utm_source=com&utm_medium=cta&utm_term=ASC&utm_campaign=VSP&utm_content=MY19 (2019 Ascent model)

[5]
https://www.subaru.com/guides/ascent/my19/?utm_source=com&utm_medium=cta&utm_term=ASC&utm_campaign=VSP&utm_content=MY19 (2019 Ascent model)

45.    Despite Subaru's representations of reliability and safety, the Defect renders the vehicles prone to premature battery—and ultimately—failure that causes the Class Vehicles to lose battery power, which strands drivers in random and sometimes dangerous locations.

46.    Because of the recurring failures from the Defect, many Class Members, including Mr. Baladi, have had to purchase equipment to jump or charge their batteries. They purchased this equipment out of necessity to avoid being without use of their vehicles or finding themselves unexpectedly stranded. The Defect, however, cannot be remedied simply by jumping or re-charging the battery.

47.    Vehicle batteries are not designed to be continually drained down to low volumes; their purpose is to provide a quick surge of electricity to start the engine. After the engine starts, the alternator provides the power the vehicle needs. When a vehicle's battery is drained to a low percentage of its total charge, its lifespan is shortened, until the battery loses all power. The Defect therefore results in the need to replace the battery in Class Vehicles far more often than is typical. Until the Defect is fixed by Subaru, replacing batteries will continue to be an ongoing expense and inconvenience for owners and lessees—especially after their warranty period has expired.

**C.    The Battery System Defect Continues to Affect Class Vehicles**

48.    Subaru has not fixed the Defect. When owners and lessees take their

Class Vehicles into Subaru dealerships for service, the dealerships at most replace the batteries. But since Subaru replaces the batteries with the same batteries, the battery-drain problem recurs. Replacing the battery is thus a temporary fix only; the new battery is prone to failure from the same Defect.

49.    The Defect arises from Subaru's decision to install batteries with insufficient capacity to power the Class Vehicles' electrical components when the vehicle is turned off. Absent a repair to the vehicle that reduces the demand on the battery, drivers whose batteries are replaced with the same battery are substantially certain to experience the Defect again.

50.    The Defect impacts the core functionality of the Class Vehicles—when it manifests, it prevents consumers from operating their automobiles.

**D.    Subaru's Knowledge of the Defect**

51.    Plaintiffs' experiences are not isolated or outlier occurrences. The internet is replete with driver complaints on message boards, social media, and other websites concerning the Battery System Defect. A Facebook group called the "Subaru Ascent Dead Battery Club" now has several hundred members.[6]

52.    Numerous complaints about the Defect appear on websites Subaru actively monitors, such as the website for the National Highway Traffic Safety Administration and Subaru's owner message boards. Many of the related complaints

---

[6] https://www.facebook.com/groups/875597246107705/ (last visited Feb. 26, 2020).

posted on social media websites such as Facebook and Twitter also tag Subaru in the posts. Although Subaru monitors these forums, it is difficult for potential consumers to do so, giving Subaru exclusive knowledge of the Defect. The following are a sampling of the complaints submitted by Class Vehicle owners, organized by model[7]:

**2019 OUTBACK**

**Long L., on 1/4/19[8]**

- "As of now, I bought the 2019 Subaru Outback for less than a week, with only 89 miles on it. I found the battery was totally dead two days ago. Called for jumper start assistance (it took the vendors a few hours to arrive). The vehicle was restarted and I drove it for 20 minutes, hoping that the battery was able to recharge by this. However, on the next day the same thing happened again. Totally unexpected and really disappointed"

**@eugenia618 responded on 1/7/19[9]**

- "Same happened to me. Missed niece's performance in the Nutcracker due to 2wk old Subaru having a dead battery. Svc said it was fine. Then required five jumps this weekend now may be up to 1/17 before they can replace it."

**NHTSA Complaint 11185059 on 3/8/2019[10]**

- DEAD BATTERY IF THE CARS SITS PARKED 2 DAYS. NOTHING LEFT ON, IT IS A PARASITIC BATTERY DRAIN. HAPPENED

---

[7] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

[8] https://www.carcomplaints.com/Subaru/Outback/2019/electrical/dead_battery.shtml (last visited Nov. 1, 2019).

[9] https://twitter.com/donnap2397/status/1211074132059791360 (last visited Feb. 25, 2020)

[10] https://www.nhtsa.gov/vehicle/2019/SUBARU/OUTBACK#complaints (last visited Feb. 26, 2020).

TWICE AND BATTERY WAS TOTALLY DEAD EACH TIME, NEEDING TO BE FULLY RECHARGED AS IT WOULDN'T TAKE A JUMP. LESS THAN 2000 MILES ON THE CAR.

**Stephen B, on 5/13/19[11]**

- "2019 OUTBACK Limited 3.6. Would not start, battery dead for the fourth time. Roadside service had to jump start the car. Complained to Stateside Subaru, they sent a tow truck and car was carried to them and they replaced the battery. I made sure nothing was left on and put the car in my garage. Two days later tried to start car, would not start. Roadside service came and jumped started the car for the fourth time. This is my first Subaru. We are afraid to take the Subaru anywhere for fear it will leave us stranded. Any suggestions would be appreciated"

**Kevin F. on 8/25/19[12]**

- "The battery has drained down twice in the same week. Car is only 6 months old. Nothing plugged in. Very annoying. I had Subaru Roadside Assistance tow it 45 miles to nearest dealer. We will see what happens. Clearly a defect in the 2019 Subaru Outback."

**<u>2018 OUTBACK</u>**

**brogonni on 11/13/19[13]**

- "I went to my Subaru Outback to unlock and the battery was dead again. This is the second time my battery was dead and I had to get a replacement that cost me $180.
  Thanks Subaru."

**Mark E.[14]**

- **on 4/24/19** "Liftgate randomly opens overnight, draining battery. Has

---

[11] https://www.carcomplaints.com/Subaru/Outback/2019/electrical/dead_battery.shtml (last visited Nov. 1, 2019).

[12] https://www.carcomplaints.com/Subaru/Outback/2019/electrical/dead_battery.shtml (last visited Feb. 25, 2020)

[13] https://www.carcomplaints.com/Subaru/Outback/2018/electrical/dead_battery.shtml (last visited Feb. 25, 2020)

[14] *Id.*

occurred 6 times since purchasing vehicle June 2018. Had to purchase portable battery jumper (cost around 200.00 to ensure not being stranded somewhere.) Dealer refused to install higher capacity battery."

- **on 5/3/19** "The car has less than 5,000 miles on it and the battery has failed 6 times! Mainly it seems to happen when the liftgate opens in the middle of the night. The dealer "can find nothing wrong" with the system . . . . Purchasing a $120.00 Battery Charger from Amazon, which has saved me the last 5 times from having to get towed or waiting for roadside assistance.

**Henry S. on 3/24/19**[15]

- "Had 3 separate occasions where we had to have the Subaru jump started. Took it in to the dealership where they cannot find anything wrong with the battery or electrical system. *They replaced battery just for good measure. Had to get it jumped again* at an airport lot where we were gone for 4 days."

**Susan H. on 3/26/19**[16]

- "2nd Dead battery March 26, 2019. Car parked in garage for most of day. Needed to go out in early evening. Battery Dead, Called Triple A who jumped started car, checked charging system, battery voltage way down. suggested I should drive car for 30 - 45 min to recharge battery. Drove car around for 45min to an hour but afraid to stop to do the errand I originally had to do because I didn't want to turn off engine. 5 days later repeat incident."

**@soulshine39 on 4/14/19**[17]

- "Sadly getting fed up with repeated dead battery on my @subaru_usa 2018 Outback. If I go 3 days without driving it, the battery is DEAD. #strandedagain          #dealerexcuses          #canttrustmycartostart #wantedtolovesubaru"

---

[15] *Id.* (emphasis added).

[16] *Id.*

[17] https://twitter.com/soulshine39/status/1117394958808383493 (last visited Feb. 25, 2020)

**@clarkbreyman on 5/30/19[18]**

- "@subaru_usa – When are you going to deal with the dead battery pattern on Outbacks?

**2018outback, on 4/10/19[19]**

- "Battery has died twice. Last time down to one volt. Dealership (Camelback Subaru) would not replace battery because it still showed that it was charged. Was told by "battery expert" if the charge is "1" or less, the battery will not take a full charge again. They WILL NOT replace it because it took a half charge. Was told by dealership that these new cars need to be driven 18 miles often in order to keep the battery charged. My car is dead. There is no solution. There is obviously some electrical system that is draining the battery when the car is turned off. The 1st time when the Subaru tech came out to recharge the battery, I was his 12th customer that morning. . . . I purchased a trickle charger to give it a little boost. I AM SCARED to drive it because it could die at anytime!

**<u>2017 OUTBACK</u>**

**Bob L. on 7/1/19[20]**

- "This is just the latest dead battery. The car electrical system has been checked at least 3 times by the dealer, the latest being today. . . . My conclusion is the electronic system drains the battery while sitting. This is exacerbated by the electric key fob turning on the electronics when brought near the car. i.e leaving the key fob in the car while working on or near it is now a no for me unless I put the fob in a tin box. I now carry a backup battery to jump start the car. I also have a Deltran 5amp Battery Tender which I plug into a wire connection permanently attached to the battery when leaving the car home for any extended time. I also turned off all the overhead lights so to prevent that from being the issue."

---

[18] https://twitter.com/clarkbreyman/status/1134220946200358913 (last visited Feb. 25, 2020)

[19] https://www.carcomplaints.com/Subaru/Outback/2018/electrical/dead_battery.shtml (last visited Nov. 1, 2019).

[20] https://www.carcomplaints.com/Subaru/Outback/2017/electrical/dead_battery.shtml (last visited Feb. 25, 2020)

**m85, on 2/19/19[21]**

- "I have a 2017 Subaru, the dead battery issue occurred at a dangerous time and place where it left me with a 12 mile hike to find the nearest person that could provide a jump start. In the morning I drove out to a remote section of a large lake, fished for a couple hours, came back and the battery was dead. After hiking 12 miles for the jump start . . . . the dealer said the drain was from repeated software update failures. This issue is extremely concerning as I'm often out fishing in far more remote places occurred with this recent incident."

**NHTSA Complaint 11254696 on 9/10/2019[22]**

- BATTERY DEAD SEVERAL TIMES. HAVE HAD TO HAVE IT JUMPED SIX TIMES. BATTERY REPLACED BY DEALER ONCE. I NOTE THAT MANY SUBARU OWNERS HAVE SIMILAR PROBLEM.

**<u>2016 OUTBACK</u>**

**Mmva on 11/10/2015**

- "car is barely 2 months old, it wouldn't start. i was told that i left my backdoor light on but I don't believe it. I took it to the dealer/service and that is what they told me. Two weeks later same problem."

  **Update from 11/19/15**
  "engine turns over but car won't start
  i have to say, i am not surprised. after it happened once, before i even had the car for two months, i just knew something was very wrong. so when it didn't start this evening -- all i could say, was oh well, what a horrible situation to be in. my 16 year old son is now driving me around with my 13 year old Honda CRV."

---

[21] https://www.carcomplaints.com/Subaru/Outback/2017/electrical/dead_battery.shtml (last visited November 1, 2019).

[22] https://www.nhtsa.gov/vehicle/2017/SUBARU/OUTBACK (last visited Feb. 26, 2020).

**Samvid D. on 5/3/2016**[23]

- "Brand new 2016 Outback bought in 2/2016. Battery has died about 4 times over the last 15 months. they replaced battery after it happened the first time - still continues to happen.
  Has about 11,000 miles currently, but problem started with under a 1000 miles on the vehicle."

**Andreaak on 10/31/2016**[24]

- "I researched various reports before settling on the 2016 Subaru Outback. This was supposed to be the last car I would ever buy . . . . Even before the cold weather set in, we came out to the car one Fall morning and it wouldn't start. I had to call for service . . . . The man explained that the battery that came with the new car is not the best quality, and that it should be replaced. While replacing the battery was done under warranty, I was charged for the trickle charger. Since the car is plugged in whenever it is not in use, I thought that would be all it needed. Boy, was I wrong."

**Sandra F. on 11/24/2016**[25]

- "Decided to drive my new car, tried to start it, battery appeared dead. Was able to jump start it with portable starter. Drove 15 minutes to first business, car restarted. Drove 5 minutes to 2nd business, car wouldn't start."

  **Update from 7/1/16**

  "After battery service from dealer 4 days ago, car won't start again and this time the portable starter won't start it. Called Subaru Roadside Assistance got a jump and drove directly to dealer. This time, battery tested BAD and was replaced with a new battery."

---

[23] https://www.carcomplaints.com/Subaru/Outback/2016/electrical/drained_battery.shtml (last visited Feb. 25, 2020)

[24] https://www.carcomplaints.com/Subaru/Outback/2016/electrical/wont_start.shtml (last visited Feb. 26, 2020)

[25] https://www.carcomplaints.com/Subaru/Outback/2016/electrical/wont_start.shtml (last visited Feb. 26, 2020)

**Fred R. on 11/24/2016**

- "We have had our Subaru for about 5 months. . . . had a problem starting it 5 or 6 times already. For instance, trying to use accessory position seems to kill the battery in about 5 minutes. And now that weather is cold I have had two cases where it just won't start. I bought a jump start battery and that has always started it right up. I have to get to the bottom of what is killing the battery!"

**John A. on 11/25/2016**[26]

- "I was on a fishing trip in a fairly remote area and when my partner and I returned to the car to leave I could not start the car. The entire electrical system was down - no lights functioning, etc. I tried all suggestions in the ownership manual and nothing worked. I called the local dealer and was informed that they could not respond. I next called AAA and eventually help arrived and we were able to get the car started with a cable jump start. My fishing partner purchased a similar Subaru about a month before I purchased mine and his wife experienced a similar problem while on a shopping trip. She was unable to start the car because the electrical system was dead. I took my car into the dealership the day after my car had failed to start and after keeping it for a day to trouble shoot the problem I was informed that they found the battery fully charged and that they could not find anything wrong with the electrical system. . . . I do not have confidence that I won't experience this non-starting problem again - especially now that I am aware that it has happened to someone else who also purchased a 2016 outback. I am curious to learn if other owners of a 2016 Subaru Outback have experienced a similar problem. When 2 of 3 people I know experienced the same problem it doesn't seem like a coincidence. How widespread is this problem and is Subaru aware of it??"

**NHTSA Complaint 11058155 on 1/2/2018**[27]

- CAR BATTERY DIES COLD WEATHER. NO WARNING. OBVIOUS DEFECT EITHER BATTERY OR ELECTRICAL DRAINAGE. I NOT

---

[26] https://www.carcomplaints.com/Subaru/Outback/2016/electrical/wont_start.shtml (last visited Feb. 25, 2020)

[27] https://www.nhtsa.gov/vehicle/2016/SUBARU/OUTBACK/SUV/AWD (last visited Feb. 26, 2020).

ONLY OWNER WITH PROBLEM. ON LINE MANY COMPLAINTS WITH BATTERY DYING AND LEAVING ONE STRANDED COLD WEATHER. SUBARU AND DEALER KNOW OF DEFECT WILL NOT WARRANTY PROBLEM. TWICE STUCK WHEN CAR PARKED ON STREET AND GARAGE. WOULDN'T START

**NHTSA Complaint 11062973 on 1/16/2018[28]**

- VEHICLE STARTING BECOMES SLOWER FOR ABOUT 1 WEEK AND THEN IT WILL NOT START AT ALL. I THEN GOT A BOOST FROM A SERVICE GARAGE IN THE FIRST INSTANCE AND DROVE THE CAR TO MY SELLING DEALER 40 KM. AWAY. . . . THEY ONLY DID DIAGNOSTIC WORK AND NO ACTUAL REPAIRS . . . . THIS HAPPENED AT 25,000 KM ON THE ODOMETER IN SEPTEMBER OF 2017. IT IS NOW JANUARY 15, 2018 AND I AM IN FLORIDA. THE CAR HAS 33,000 KM. ON IT THE EXACT SAME THING HAPPENED, WITH A SLOW TO TURN OVER FOR ABOUT 1 WEEK AND THEN FAILURE TO START. I TESTED THE BATTERY WITH A LOAD TESTER AND IT TESTED AS "BAD" ON THE GAUGE. WE THEN BOOSTED IT TO START AND TESTED THE VOLTAGE FROM THE ALTERNATOR WHICH WAS 14 VOLTS AND THE BATTERY TESTED 12 VOLTS. AFTER A FEW MINUTES OF RUN TIME WE TURNED IT OFF AND IT FAILED TO START AGAIN. . . . IT LEAVES YOU WONDERING WHEN YOU WILL BE STRANDED IN THE WILDERNESS OR THE SIDE OF AN INTERSTATE HIGHWAY.

**GuruW291 about a year ago[29]**

- "I also have a 2016 Subaru Outback that has failed to start on 3 occasions and each time after boosting it tests OK, but testing before the boost it says bad battery. The 3rd time this happened I had it taken to the dealer . . . . this is a safety issue if you are a long way from help. Too bad Subaru engineers don't find the solution. POOR SERVICE"

---

[28] *Id.*

[29] https://www.cargurus.com/Cars/Discussion-t58701_ds833514 (last visited Feb. 25, 2020)

**GuruXNCQZ about a year ago[30]**

- "We just had to get rid of our 2016 Outback. The battery kept dying, usually after driving it several hours. . . . Our neighbor got rid of his 2016 Outback with the same problem."

**Guru BJTG2 about a year ago[31]**

- "Just purchased a Subaru yesterday. We got it home and it died. Also died at the dealership before we drove it out of the lot. We called and told them to come get this car and that we don't want it."

**@joe_aravindan on 9/2/19[32]**

- "@subaru_usa – Having Starting problems with '16 Outback not fixed for last 3 years, with 3 dead batteries replaced and lot of msgs in form about same issue why this shouldn't be a recall ? . . . its time for manufacturer to fix"

## **SUBARU ASCENT**

**Lynn P. on 1/9/19[33]**

- "The first time it happened to me, I was the last person on a large, remote training property with my 2 dogs (hunting training). Battery died, locking the two dogs in the rear with no way to get them out. I was fortunate enough to have cell service and was able to reach another person I had trained with and she circled back to the property to help jump start my car. that was the beginning of several dead battery incidents which then occurred while I was out of state training my dogs. In fact, it happened 3 days in a row while training on huge plantations in GA with no cell service. . . . After my car died 3 days in a row in GA, I bought a battery disconnect

---

[30] *Id.*

[31] *Id.*

[32] https://twitter.com/joe_aravindan/status/1168584383432781825 (last visited Feb. 25, 2020)

[33]

https://www.carcomplaints.com/Subaru/Ascent/2019/electrical/open_tailgate_drains_battery.shtml (last visited Feb. 25, 2020)

switch (which I then made Subaru pay for and the dealer install) and I now cut the battery off every time I train my dogs. I ended up buying a new non-Subaru battery (Odyssey) . . . Take a look at the Facebook group called Subaru Ascent Dead Battery Club to see what others have experienced. . . . Hopefully if enough people complain, Subaru will realize that this is a real problem for people who want to use this $45k car in the manner in which Subaru advertises!!"

**phiggins630ph on 7/7/19**[34]

- "I went out in my garage and noticed the tailgate was up. The car is used only occasionally, maybe once a week. I tried to close the tailgate but nothing happened. The battery was dead. I did not operate the tailgate earlier and don't know how it opened. I jumped started the car and it started easily. However . . . now the car does not recognize my Bluetooth cell phone nor does it respond to the time and date updates on the phone. . . . I will send a letter to Subaru to see if this is a problem with other Ascents. This is the first time I noticed the tailgate apparently causing the battery drain but on three other occasions I had to jump start the Ascent."

**Jean R. on 10/25/19**[35]

- "So – I'm experiencing the same as other postings here, which is disappointing at best, and scary at worst. The first time my Ascent had no power, I got a jump start and took it to the dealer - they replaced the battery claiming a 'bad cell'. Then - about 5 months later, lost complete power again. Jump started it, took it to the dealer. They kept it 2 days, couldn't find anything wrong. And now - it happened again!" I also bought the Ascent for use with my dogs and thank God they haven't been in their kennels in the back when the power was lost - I would not be able to get them out!"

**@rich_comeau on 7/16/19**[36]

- "@SubaruLegitNews I just had my 2019 Subaru Ascent battery changed

---

[34] *Id.*

[35] https://www.carcomplaints.com/Subaru/Ascent/2019/electrical/doesnt_start.shtml (last visited Feb. 25, 2020)

[36] https://twitter.com/rich_comeau/status/1151329124897701888 (last visited Feb. 25, 2020)

due to dead battery and stranded 5 times calling AAA for a jump. There is an issue with this model and Subaru should recall for the battery drain."

**Laura J Carpent, on 10/20/19[37]**

- "I too have brand new 2020 ascent now 3200mi bought aug '19, battery draining issue, jump 3 times, now alternator wont recharge battery after 6 hr drive, and now Car Play, bluetooth phone microphone not working -- all in one weekend.. has anyone tried getting dealer full refund using lemon law attorney general lawsuit? I cant believe a jump start kit ill have to keep w me after car ownership of 40 yrs, never have i had to do this, Ive owned range rovers, mercedes, tahoes, denalis...in subzero buffalo NY."

**Jennifer G. , on 7/27/19[38]**

- "I, too, have a 2019 Ascent and only left the hatchback open for 10-15 minutes as I was loading up the car. Closed the hatchback, got into the car and... car battery DEAD with my dogs LOCKED INSIDE and no way to get them out in 100 DEGREE WEATHER!! Dogs were in crates that faced the hatchback too! INCREDIBLY SCARY SITUATION!!

**Alison Harris, on 10/19/19[39]**

- "Here is our latest dead battery saga. Our battery started dying about 2 months into buying it brand new. We would jump it and run it, only to have it die later in the evening. . . . We had jumped it enough to hit the roadside button in the car, so it started for [the dealer]. Lo and behold it died again for them. Told us it was a bad battery.

**NHTSA Complaint 11306550 on 2/2/2020[40]**

- MY 2019 ASCENT WAS PARKED IN GARAGE OVERNIGHT. WENT OUT TO CAR AND FOUND REAR TAILGATE WOULD NOT OPEN AND CAR WOULD NOT START. BATTERY WAS DEAD. JUMPSTARTED CAR AND DROVE IT TO THE STORE. WHEN I

---

[37] https://www.torquenews.com/1084/new-subaru-ascent-owners-say-glitch-suvs-tailgate-could-leave-you-dead-battery (last visited Nov. 1, 2019).

[38] *Id.* (last visited Nov. 1, 2019).

[39] https://www.facebook.com/groups/875597246107705/permalink/992580571076038/ (last visited Nov. 4, 2019).

[40] https://www.nhtsa.gov/vehicle/2019/SUBARU/ASCENT (last visited Feb. 26, 2020).

PARKED THE CAR IT WENT DEAD, CAR WOULD NOT RESTART, AND WOULD NOT LOCK, TAILGATE WOULD NOT OPEN. HAD TO GET ROADSIDE SERVICE TO COME OUT AND START CAR. TOOK CAR TO DEALER AND THEY SAID THEY COULD NOT FIND ANYTHING WRONG BUT DID REPLACE THE BATTERY. SEVERAL WEEKS LATER WHILE CAR WAS PARKED AND LOCKED IN A STORE PARKING LOT I CAME OUT AND FOUND THE REAR TAILGATE OPEN. NO ONE HAD PUSHED THE REMOTE TO OPEN THE TAILGATE? TODAY I FOUND THE CAR PARKED IN THE GARAGE AND THE TAILGATE WOULD NOT OPEN, THE CAR WOULD NOT START, AND THE BATTERY WAS DEAD AGAIN. . . . THE CAR HAD BEEN DRIVEN NORMALLY AROUND TOWN FOR THE LAST FEW DAYS. . . . ALL THE DOORS WERE SHUT AND NO LIGHTS HAD BEEN LEFT ON. THE CAR WAS PURCHASED IN JUNE 2019 AND HAS LESS THAN 6000 MILES ON IT . . . . I AM CONCERNED ABOUT DRIVING THE CAR AND BEING LEFT ON THE ROAD BY A DEAD BATTERY OR COMING OUT AND FINDING THE REAR TAILGATE OPEN IN A PARKING LOT.

53.    In addition to being on notice of the Defect through NHTSA and other complaints, Subaru also directly learned of the increasing battery problems from its network of dealerships. Many of the customers who wrote online or to Subaru about their bad experiences with the Defect report having taken their Class Vehicles into Subaru dealerships because of the Defect. Subaru itself has seen a significant increase in warranty claims relating to batteries, starting as early as 2015 or 2016 when it began selling the 2016 Outback.

54.    Confirming its knowledge of the Defect, Subaru issued a Technical

Service Bulletin ("TSB") dated June 15, 2017 and revised on October 31, 2017.[41] This TSB involved a reprogramming to attempt to address customer concerns that included "[p]otential battery discharge (dead battery) after repeated periods of short-trip driving." Hence, prior to June 15, 2017, Subaru was aware of and made an unsuccessful attempt to fix the Defect in the Class Vehicles being produced at that time.

55.    Despite its knowledge of the Battery System Defect, Subaru failed to disclose it to Plaintiffs and other Class Members. Subaru could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through its network of dealers, in owners' manuals, on its website, in Class Vehicle brochures, and on Class Vehicle Monroney stickers. Had Subaru disclosed the Defect in any of these places, reasonable consumers would have been aware of it. But, instead of notifying the consuming public or Class Vehicle owners and lessees of the Defect, Subaru continued to sell and lease Class Vehicles, advertising them as reliable.

**E.    Subaru Continues Manufacturing Class Vehicles with the Battery System Defect Despite Knowledge of the Defect**

56.    The Battery System Defect first manifested in the 2016 Subaru Outback. Despite receiving complaints from 2016 Outback drivers, Subaru

---

[41] Available at https://static.nhtsa.gov/odi/tsbs/2017/MC-10131689-9999.pdf (last visited Feb. 25, 2020).

continued to design, manufacture, and sell four additional model years of Outbacks with the same Defect and without informing prospective buyers about the Defect.

57.    Subaru introduced the Ascent, a larger SUV, to its vehicle lineup for the 2019 model year. The 2019 and 2020 Subaru Ascents suffer from the Defect.

58.    Despite receiving complaints about the Defect pertaining to 2016, 2017, and 2018 Outbacks, Subaru did not address the Defect in its 2019 Outback.

59.    After three years of mounting complaints about the Defect in Outbacks, Subaru knew about the Defect before it launched the Ascent, which was new to Subaru's lineup for the 2019 model year.

60.    An internal report dated April 26, 2019, from Subaru's Quality Improvement Committee noted that Subaru was already concerned with battery failure problems in the 2020 Outback, which was set to enter production in the summer.[42]

61.    Despite its long-running knowledge of the Battery System Defect, Subaru still does not inform prospective buyers about the Defect. Nor has Subaru developed an effective fix for the sudden failures it causes.

62.    As a consequence of Subaru's actions and inaction, Class Vehicle

---

[42] Hans Greimel, *Behind the scenes, Subaru races to boost quality; Problems Blamed on Workers, Suppliers, Designers*, 93 AUTOMOTIVE NEWS 1 (June 24, 2019), https://www.autonews.com/sales/behind-scenes-subaru-races-boost-quality (explaining a Subaru document from April 2019 noted that there were problem in Outbacks with "battery failure").

owners have been deprived of the benefit of their bargain, lost use of their Class Vehicles for extended periods of time, been exposed to dangerous conditions from being stranded, and incurred lost time and out-of-pocket costs—including from payments for (1) alternative means of transportation such as rideshares or rental cars, (2) roadside assistance to tow or jump-start their cars, and (3) equipment to charge, attempt to preserve, or jump-start their vehicle batteries. Class Vehicles also have suffered a diminution in value due to the Defect.

63.    Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

## CLASS ACTION ALLEGATIONS

64.    This action is brought and may be maintained as a class action, pursuant to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure.

65.    The Class is defined as follows:

All persons in the United States who bought or leased, other than for resale, a Class Vehicle.

66.    In addition, state subclasses are defined as follows:

**California Subclass**
All persons in the state of California who bought or leased, other than for resale, a Class Vehicle.

**New York Subclass**
All persons in the state of New York who bought or leased, other than for resale, a Class Vehicle.

67.    Excluded from the Class are Subaru, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

68.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of Subaru and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased nationwide. Members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by Subaru in connection with its sales and leases of Class Vehicles.

69.    **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

   a.    whether Subaru engaged in the conduct alleged herein;

   b.    whether Class Vehicles are defective;

   c.    whether Subaru placed Class Vehicles into the stream of

commerce in the United States with knowledge of the Defect;

d.    whether Subaru knew or should have known of the Defect, and if so, for how long;

e.    when Subaru became aware of the Defect in the Class Vehicles;

f.    whether Subaru knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g.    whether Subaru's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h.    whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

i.    whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.    whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Subaru's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.    whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

70.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class because the Plaintiffs purchased or leased a Class Vehicle containing the Defect, as

did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by Subaru's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Subaru relating to the conduct alleged herein, and the same conduct on the part of Subaru gives rise to all the claims for relief.

71.    **Adequacy**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

72.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive

supervision by a single court.

73.    **Injunctive Relief**: Subaru has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750–1785**
**Plaintiff Tomasian, Individually and on Behalf of the California Subclass**

74.    Plaintiff Tomasian incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

75.    Plaintiff Tomasian brings this claim individually and on behalf of the California Subclass.

76.    Plaintiff Tomasian and the members of the California Subclass are "consumers" as defined under the CLRA. *See* Cal. Civ. Code § 1761(d).

77.    Subaru is a "person" as defined under the CLRA. *See* Cal. Civ. Code § 1761(c).

78.    Class Vehicles are "goods" as defined under the CLRA. *See* Cal. Civ. Code § 1761(a).

79.    The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to

result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

80.    Subaru engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by knowingly and intentionally concealing from Plaintiff and the California Subclass members that the Class Vehicles suffer from the Battery System Defect (and the costs, risks, and diminished value of the Class Vehicles as a result of this Defect). Subaru's conduct violated at least the following enumerated CLRA provisions:

    a.    Subaru represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

    b.    Subaru represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

    c.    Subaru advertises its Class Vehicles with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

    d.    Subaru represents that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

    e.    Subaru inserts an unconscionable provision into its warranty in violation of section 1770(a)(19).

81.    Subaru's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing

public, and created a serious safety hazard for the public.

82.    Subaru knew, should have known, or was reckless in not knowing that the Class Vehicles were defective, would fail prematurely, and were not suitable for their intended use.

83.    Subaru was under a duty to Plaintiff and the California Subclass members to disclose the defective nature of the Class Vehicles and the Defect because:

      a.    Subaru knew of but actively concealed the Defect from Plaintiff and the California Subclass;

      b.    Subaru was in a superior and exclusive position to know the true facts about the Defect, which affects the central functionality of the vehicle and poses safety concerns, and Plaintiff and the Subclass members could not reasonably have been expected to discover that the Class Vehicles contained the Defect until it manifested, which Subaru knew; and

      c.    Subaru made partial representations regarding the reliability, safety, and quality but suppressed facts regarding the Defect.

84.    The facts that Subaru misrepresented to and concealed from Plaintiff and the other California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Vehicles or pay a lesser price for them.

85.    The Defect poses a serious safety defect and affects the central functionality of a vehicle because it renders the vehicle inoperable.

86.    In failing to disclose the material Defect, Subaru has knowingly and intentionally concealed material facts in breach of its duty to disclose.

87.    Plaintiff Tomasian and the California Subclass have suffered injury in fact and actual damages resulting from Subaru's material misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff Tomasian and the Subclass known about the defective nature of the Class Vehicles and the Defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

88.    As a direct and proximate result of Subaru's unfair and deceptive conduct, therefore, Plaintiff and the California Subclass members have been harmed.

89.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiff sent a letter to Subaru notifying it of its CLRA violations and providing it with an opportunity to correct its business practices. If Subaru does not correct its business practices, Plaintiffs will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, and punitive damages under the CLRA.

90.    Pursuant to Cal. Civ. Code § 1780(a), Plaintiff Tomasian, individually and on behalf of the California Subclass, seeks injunctive relief for Subaru's violation of the CLRA.

91.    Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiff

Tomasian, individually and on behalf of the California Subclass, seeks compensatory and punitive damages under the CLRA and to recover her attorneys' fees and costs.

92.    Plaintiff's CLRA venue declaration is attached as Exhibit 1 to this complaint in accordance with Cal. Civ. Code § 1780(d).

## COUNT II
**Violations of the California Unfair Competitions Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200–17210**
**Plaintiff Tomasian, Individually and on Behalf of the California Subclass**

93.    Plaintiff Tomasian incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

94.    Plaintiff Tomasian brings this claim individually and on behalf of the California Subclass.

95.    The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Subaru's conduct violates each of these prohibitions.

### Unlawful Conduct

96.    Subaru's conduct is unlawful, in violation of the UCL, because, as set forth herein, it violates the Song–Beverly Consumer Warranty Act, the MMWA, and the CLRA.

**Unfair Conduct**

97.     Subaru's conduct is unfair because it violated California public policy, legislatively declared in the Song–Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The Defect renders the Class Vehicles completely inoperable.

98.     Subaru acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

    a.      Knowingly selling Plaintiff Tomasian and California Subclass members Class Vehicles with the Defect;

    b.      Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the Defect during the warranty period;

    c.      Refusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period;

    d.      Failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

    e.      Failing to acknowledge the scope and severity of the Defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective, and failing to provide adequate relief.

99.     The gravity of the harm resulting from Subaru's unfair conduct

outweighs any potential utility of the conduct. The practice of selling defective Class

Vehicles without providing an adequate remedy to cure the Defect harms the public

at large and is part of a common and uniform course of wrongful conduct.

100.   There are reasonably available alternatives that would further Subaru's

business interests of increasing sales and preventing false warranty claims. For

example, Subaru could have: (a) acknowledged the Defect and provided a

permanent, effective fix for the Defect; and/or (b) disclosed the Defect prior to

prospective consumers' purchases.

101.   The harm from Subaru's unfair conduct was not reasonably avoidable

by consumers. The Class Vehicles all suffer from the latent Defect, and Subaru has

failed to disclose it. Plaintiff and California Subclass members did not know of, and

had no reasonable means of discovering, the Defect.

### Fraudulent Conduct

102.   Subaru's conduct is fraudulent in violation of the UCL. Subaru's

fraudulent acts include knowingly and intentionally concealing from Plaintiff and

the California Subclass members the existence of the Defect and falsely marketing

and misrepresenting the Class Vehicles as being functional and not possessing a

defect that would render them inoperable.

103.   Subaru's misrepresentations and omissions alleged herein caused

Plaintiff and the California Subclass members to purchase or lease their Class

Vehicles or pay more than they would have had Subaru disclosed the Defect.

104.   At all relevant times, Subaru had a duty to disclose the Defect because it had superior and exclusive knowledge of the Defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because Subaru made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the Defect.

105.   Accordingly, Plaintiff Tomasian and California Subclass members have suffered injury in fact, including lost money or property, as a result of Subaru's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiff Tomasian and California Subclass members would not have purchased or lease their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

106.   Plaintiff Tomasian seeks appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin Subaru from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore Plaintiff and California Subclass members any money Subaru acquired by its unfair competition, including restitution. Plaintiff also seeks reasonable attorneys' fees and expenses under applicable law.

**<u>COUNT III</u>**
**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Express Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Tomasian, Individually and on Behalf of the California Subclass**

107.    Plaintiff Tomasian incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

108.    Plaintiff Tomasian brings this claim individually and on behalf of the California Subclass.

109.    Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

110.    The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

111.    Subaru is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

112.    Subaru made express warranties to Plaintiff and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

113.    Subaru breached these express warranties by selling and leasing defective Class Vehicles that required repair or replacement within the applicable warranty period. Despite a reasonable number of attempted repairs, Subaru has failed to adequately repair the Defect.

114.    Subaru has failed to promptly replace or buy back the vehicles of Plaintiff and the proposed California Subclass members as required under Cal. Civ. Code § 1793.2(d)(2).

115.    As a direct and proximate result of Subaru's breach of its express

warranties, Plaintiff Tomasian and the California Subclass members received goods in a condition that substantially impairs their value to Plaintiff and the other Subclass members. Plaintiff and the California Subclass members have been damaged as a result of, *inter alia*, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

116.   Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the California Subclass members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

117.   Pursuant to Cal. Civ. Code § 1794(d), (e), Plaintiff and the California Subclass members are entitled to reasonable costs and attorneys' fees.

### COUNT IV
**Violations of Song–Beverly Consumer Warranty Act**
**For Breach of Implied Warranty**
**Cal. Civ. Code §§ 1790–1795.8**
**Plaintiff Tomasian, Individually and on Behalf of the California Subclass**

118.   Plaintiff Tomasian incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

119.   Plaintiff Tomasian brings this claim individually and on behalf of the California Subclass.

120.   Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

121.   The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

122.   Subaru is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

123.   Subaru impliedly warranted to Plaintiff Tomasian and the California Subclass members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

124.   Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

> (1) Pass without objection in the trade under the contract description.
> (2) Are fit for the ordinary purposes for which such goods are used.
> (3) Are adequately contained, packaged, and labeled.
> (4) Conform to the promises or affirmations of fact made on the container or label.

125.   The Defect in the Class Vehicles is present in them when sold and substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the Defect causes all or substantially all of the vehicles to experience complete battery and power failure and to fail to operate as intended. The Defect thus affects the central functionality of the vehicle and poses

a serious safety risk to driver and passenger safety, leading to hundreds of dollars in repair expenses, out-of-pocket costs to purchase battery chargers, and inconvenient service calls.

126. Because the Defect creates an unreasonable risk to driver and passenger safety, and because the Class Vehicles are unfit for their ordinary purpose due to the Defect, which causes complete loss of power and inoperability, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

127. Class Vehicles are not adequately labeled because the labeling fails to disclose the Battery System Defect and does not advise the California Subclass members of the Battery System Defect.

128. Any attempt by Subaru to disclaim its implied warranty obligations under the Song-Beverly Act is ineffective due to its failure to adhere to Sections 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). Subaru's attempted implied warranty disclaimer does not conform to

these requirements.

129.   The Battery System Defect deprived Plaintiff and the California Subclass members of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiff and other California Subclass members paid.

130.   As a direct and proximate result of Subaru's breach of its implied warranties, Plaintiff and California Subclass members received goods that contain a defect that substantially impairs their value. Plaintiff and the California Subclass members have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

131.   Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and California Subclass members are entitled to damages and other legal and equitable relief, including, *inter alia*, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Vehicles, and reasonable attorneys' fees and costs.

### COUNT V
**Violations of the New York General Business Law**
**N.Y. Gen. Bus. Law § 349 ("NYGBL § 349")**
**Plaintiff Baladi, Individually and on Behalf of the New York Subclass**

132.   Plaintiff Baladi incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

133.   Plaintiff Baladi brings this claim individually and on behalf of the New York Subclass.

134.   NYGBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

135.   In the course of Subaru's business in the conduct of trade or commerce, it willfully failed to disclose and actively concealed the Battery System Defect and the true reliability, safety, and quality of the Class Vehicles as set forth herein.

136.   Accordingly, Subaru engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in NYGBL § 349, including representing that Class Vehicles have characteristic, uses, benefits, and qualities that they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

137.   Subaru's deceit was directed at widely purchased consumer vehicles and consequently affects the public interest. Subaru's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

138.   Subaru's conduct proximately caused injuries to Plaintiff Baladi and New York Subclass members.

139.   Plaintiff Baladi and New York Subclass members have suffered ascertainable loss as a result of Subaru's conduct in that Plaintiff and New York

Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain, paid out-of-pocket costs relating to the Defect, and their Class Vehicles have suffered a diminution in value. These injuries are the direct, natural, and reasonably foreseeable consequence of Subaru's misrepresentations and omissions.

140.    Plaintiff Baladi, individually and on behalf of the New York Subclass, therefore requests that this Court enter such orders or judgments as may be necessary to enjoin Subaru from continuing their unfair, unlawful, and deceptive practices. Plaintiff and New York Subclass members are entitled to recover their actual damages or $50, whichever is greater. Subaru acted willfully or knowingly, so Plaintiff and New York Subclass members are entitled to recover three times their actual damages. Plaintiff and the New York Subclass are also entitled to reasonable attorneys' fees and expenses.

## COUNT VI
**Violations of the New York General Business Law**
**N.Y. Gen. Bus. Law § 350 ("NYGBL § 350")**
**Plaintiff Baladi, Individually and on Behalf of the New York Subclass**

141.    Plaintiff Baladi incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

142.    Plaintiff Baladi brings this claim individually and on behalf of the New York Subclass.

143.    NYGBL § 350 makes unlawful "[f]alse advertising in the conduct of

any business, trade or commerce . . . ."

144.    False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity . . . ." NYGBL § 350-a.

145.    Subaru caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including Plaintiff Baladi and New York Subclass members.

146.    Subaru violated NYGBL § 350 because the representations or omissions regarding the Battery System Defect in Class Vehicles as described above were material and likely to deceive a reasonable consumer.

147.    Plaintiff Baladi and New York Subclass members have suffered injury, including lost money or property, as a result of Subaru's false advertising. In purchasing or leasing Class Vehicles, Plaintiff Baladi and Class Members relied on the misrepresentations and/or omissions of Subaru with respect to the reliability, safety, and quality of the Class Vehicles. Subaru's representations were untrue because the Class Vehicles are prone to suffer excessive battery failure, total loss of

functionality, and serious safety risks as described herein due to the Defect. Had Plaintiff Baladi and the New York Subclass members known these true facts, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

148.    Accordingly, Plaintiff Baladi and New York Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

149.    Plaintiff Baladi, individually and on behalf of the New York Subclass, request that this Court enter such orders or judgments as may be necessary to enjoin Subaru from continuing its unfair, unlawful, and deceptive practices. Plaintiff and New York Subclass members are entitled to recover their actual damages or $50, whichever is greater. Subaru acted willfully or knowingly, so Plaintiff and New York Subclass members are entitled to recover three times their actual damages (of up to $10,000 per individual). Plaintiff and New York Subclass members are also entitled to reasonable attorneys' fees.

## COUNT VII
### Breach of Express Warranty
### Plaintiffs, Individually and on Behalf of the State Subclasses

150.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

151.    Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

152.   Subaru is a "merchant" as defined under the Uniform Commercial Code (UCC).

153.   The Class Vehicles are "goods" as defined under the UCC.

154.   Subaru provided a New Vehicle Limited Warranty that expressly warranted Subaru would repair any defects in materials or workmanship free of charge during the applicable warranty periods.

155.   Subaru breached its warranty by failing to provide an adequate repair when Plaintiffs and the Class Members presented their Class Vehicles to authorized Subaru dealers following manifestation of the Defect.

156.   The warranty formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

157.   Plaintiffs and Class Members experienced the Defect within the warranty period. Despite the existence of the express warranty and multiple repair attempts, Subaru failed to inform Plaintiffs and Class Members of the Defect and failed to adequately repair the Defect.

158.   As a result of Subaru's breach of its express warranty, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses to purchase battery chargers and for maintenance and service expenses to temporarily fix the Defect as well as

towing, roadside assistance, and alternative transportation costs that they otherwise would not have incurred but for the Defect.

159.  Subaru was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Subaru and its authorized dealers, Class Members taking their vehicles to its dealers, Plaintiffs' demand letters, and this lawsuit.

160.  Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of Subaru's conduct described herein.

161.  In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Subaru to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to Subaru's authorized dealers on numerous occasions and Subaru has failed to remedy the Defect. As a result, Plaintiffs and Class Members are left with defective vehicles that do not function as intended and, therefore, have been deprived of the benefit of their bargains.

162.  In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Subaru to limit its express warranty in a manner

that would exclude or limit coverage for the Defect would be unconscionable. Subaru's warranties were adhesive and did not permit negotiations. Subaru possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Subaru concealed and did not disclose this Defect, and Subaru did not remedy the Defect prior to sale (or afterward).

## <u>COUNT VIII</u>
### Breach of the Implied Warranty of Merchantability
### Plaintiffs, Individually and on Behalf of the State Subclasses

163.  Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

164.  Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

165.  Subaru is a "merchant" as defined under the UCC.

166.  The Class Vehicles are "goods" as defined under the UCC.

167.  A warranty that the Class Vehicles were in merchantable quality and condition arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. Subaru impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and the absence of material defects, and that the vehicles would pass without objection in the automotive trade.

168.  The Class Vehicles, when sold and leased, and at all times thereafter,

were not in merchantable condition or fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles were not merchantable in that the Defect renders the vehicle completely inoperable, which may also leave drivers and passengers stranded, unexpectedly, in perilous locations. The Defect therefore renders the Class Vehicles unfit to provide safe and reliable transportation.

169.  Subaru was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to Subaru and its authorized dealers, class members taking their vehicle to its dealers, Plaintiffs' demand letters, and the instant lawsuit.

170. Plaintiffs and the other Class Members have had sufficient direct dealings with either Subaru or its agents, including its authorized dealerships, to establish privity of contract between Subaru on the one hand and Plaintiffs and each Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

171. In its capacity as a supplier and/or warrantor, and by the conduct

described herein, any attempt by Subaru to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. Subaru's warranties were adhesive and did not permit negotiations. Subaru possessed superior and exclusive knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. Subaru concealed and did not disclose this Defect, and Subaru did not remedy the Defect prior to sale (or afterward).

172. As a direct and proximate result of the breach of these warranties, Plaintiffs and Class Members were injured and are entitled to damages.

**COUNT IX**
**Violations of the Magnuson–Moss Warranty Act ("MMWA")**
**15 U.S.C. §§ 2301–2312**
**All Plaintiffs, Individually and on Behalf of the Nationwide Class**

173. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

174. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

175. Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

176. Subaru is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

177. The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

178.  15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

179.  Subaru's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under the MMWA, 15 U.S.C. § 2301(7).

180.  Subaru breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles contain the Defect that cause the vehicles to be inoperable, which renders the vehicles unfit for their intended use and unsafe.

181. Plaintiffs and the other Class Members have had sufficient direct dealings with either Subaru or its agents (e.g., dealerships) to establish privity of contract between Subaru on the one hand and Plaintiffs and each Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Class Members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

182. Plaintiffs and Class Members have afforded Subaru a reasonable

opportunity to cure its breach of written warranties, and any further opportunity would be unnecessary and futile here as Subaru has failed to remedy the Defect.

183.  At the time of sale or lease of each Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure under the MMWA and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

184.  Plaintiffs and the Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class Members have not re-accepted their Class Vehicles by retaining them.

185.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

186.  Plaintiffs individually and on behalf of the other Class Members, seek

all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT X
### Fraudulent Concealment
### All Plaintiffs, Individually and on Behalf of the State Subclasses

187. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

188. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

189. Subaru made material omissions concerning a presently existing or past fact in violation of common law. Subaru did not fully and truthfully disclose to its customers the true nature of the Battery System Defect. A reasonable consumer would not have expected the Defect in a new vehicle and especially not a Defect that rendered the vehicle inoperable, posing a serious safety risk.

190. Subaru made these omissions with knowledge of their falsity and with the intent that Plaintiffs and Class Members rely upon them.

191. The facts concealed, suppressed, and not disclosed by Subaru to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles or pay a lesser price.

192. Subaru had a duty to disclose the true quality and reliability of the Class

Vehicles because the knowledge of the Defect and its details were known and/or accessible only to Subaru; Subaru had superior knowledge and access to the relevant facts; and Subaru knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class Members. Subaru also had a duty to disclose because it made many affirmative representations about the qualities and reliability of its vehicles, including references as to safety and general operability, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual reliability of their vehicles.

193. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less in doing so. Thus, Plaintiffs and the other Class Members were fraudulently induced to lease or purchase Class Vehicles, containing the Defect.

194. Plaintiffs and Class Members reasonably relied on Subaru's material omissions and suffered damages as a result. Subaru's conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and Class Members are entitled to an award of punitive damages.

**<u>COUNT XI</u>**
**Unjust Enrichment**
**In the Alternative to All Other Claims**
**All Plaintiffs, Individually and On Behalf the State Subclasses**

195. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

- 56 -

196.  Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

197.  This claim is pleaded in the alternative to the other claims set forth herein.

198.  As the intended and expected result of its conscious wrongdoing, Subaru has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

199.  Subaru has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Subaru had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle inoperable and unreliable and poses a serious safety risk.

200.  Subaru has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and unearned monies from Plaintiffs and the Class rightfully belonging to them.

201.  Equity and good conscience militate against permitting Subaru to retain these profits and benefits from its wrongful conduct. They should accordingly be disgorged or placed in a constructive trust so that Plaintiffs and Class Members can

obtain restitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, hereby request that this Court enter an Order against Subaru providing for the following:

A.    Certification of the proposed Class and/or Subclasses, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

B.    An order permanently enjoining Subaru from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Injunctive relief in the form of a recall or free replacement program;

D.    Equitable relief, including in the form of buyback of the Class Vehicles;

E.    Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An Order requiring Subaru to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G.    An award of reasonable attorneys' fees and costs as permitted by law; and

H.    Such other or further relief as may be appropriate.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: March 25, 2020                    Respectfully submitted,

                            By:    /s/ *Benjamin F. Johns*
                                   Benjamin F. Johns (NJ Bar No. 038182005)
                                   Andrew W. Ferich (NJ Bar No. 015052012)
                                   Alex M. Kashurba (NJ Bar No. 140712014)
                                   Zachary P. Beatty (*pro hac vice* forthcoming)
                                   **CHIMICLES SCHWARTZ KRINER**
                                   **& DONALDSON SMITH LLP**
                                   361 W. Lancaster Avenue
                                   Haverford, Pennsylvania 19041
                                   Tel: (610) 642-8500
                                   bfj@chimicles.com
                                   awf@chimicles.com
                                   amk@chimicles.com
                                   zpb@chimicles.com

                                   Adam E. Polk (*pro hac vice* forthcoming)
                                   Jordan Elias (*pro hac vice* forthcoming)
                                   **GIRARD SHARP LLP**
                                   601 California Street, 14th Floor
                                   San Francisco, California 94108
                                   Tel: (415) 981-4800
                                   apolk@girardsharp.com
                                   jelias@girardsharp.com

                                   *Counsel for Plaintiffs*